IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| KIMBERLY ANNE AHNEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv98 (JRS) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION

Kimberly Ahnen ("Plaintiff") is forty-nine years old and previously worked as a pharmacy technician. On August 6, 2010, Plaintiff filed for Disability Insurance Benefits ("DIB"), claiming disability from spinal stenosis, lupus anticoagulant, osteoarthritis, carpal tunnel syndrome, asthma, hypertension, renal disease and limited mobility, with an alleged onset date of March 11, 2008. Her claims were denied initially and upon reconsideration. On October 25, 2012, Plaintiff (represented by counsel), Plaintiff's husband and a vocational expert ("VE") testified at a hearing before an Administrative Law Judge ("ALJ"). On November 5, 2012, the ALJ denied Plaintiff's request for benefits, finding that she was not disabled under the Social Security Act ("Act"). On December 18, 2013, the Appeals Council denied her request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing Plaintiff's credibility and in affording limited weight to Plaintiff's physical therapist's opinion. Defendant responds that the ALJ did not err and that

substantial evidence supports the ALJ's decision. The parties have submitted cross-motions for summary judgment, which are now ripe for review.

Having reviewed the entire record in this case,[1] the Court is now prepared to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical history, state agency physicians' opinions, Plaintiff's testimony, Plaintiff's husband's testimony and VE testimony are summarized below.

A. Education and Work History

Plaintiff was forty-three years old on her alleged onset date. (R. at 218.) Plaintiff graduated from high school and completed some phlebotomy school, but did not become certified to draw blood. (R. at 38, 223.) She previously worked as a pharmacy technician, administrative assistant, call center account specialist and agent/supervisor. (R. at 223, 243.) Plaintiff last worked on March 11, 2008. (R. at 40.)

B. Medical History

On March 29, 2007, Plaintiff visited Jeffrey R. Rehm, M.D. at Pulmonary Associates of Fredericksburg for a pulmonary function test. (R. at 300.) A physical examination and

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth) and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

pulmonary function test revealed that Plaintiff had moderate obstructive lung disease, likely a result of smoking. (R. at 300.) Dr. Rehm described Plaintiff as "well-nourished" and in "no apparent distress." (R. at 300.) Plaintiff's extremities did not exhibit signs of edema. (R. at 300.) Dr. Rehm instructed Plaintiff to stop smoking and to continue taking her medication as prescribed. (R. at 300.)

On March 11, 2008, Plaintiff underwent surgery to correct mandibular hypoplasia — a congenital malformation of the mandible — at Walter Reed Army Medical Center. (R. at 376-79.) No complications occurred during the procedure. (R. at 376-79.) On April 4, 2008, during a follow-up appointment, Plaintiff complained of a swollen right mandible, fevers, pain and difficulty swallowing. (R. at 332.) Plaintiff underwent further procedures and was hospitalized because of a mandibular infection. (R. at 332-33.) On April 17, 2008, Plaintiff was discharged from the hospital and returned home to recuperate after she showed stable vital signs and no fever. (R. at 333.) Further, Plaintiff acknowledged that medication controlled her pain. (R. at 333.)

On October 15, 2008, Plaintiff returned to Dr. Rehm at Pulmonary Associates of Fredericksburg. (R. at 297.) Plaintiff had resumed smoking and was caring for an invalid living in her home. (R. at 297.) Dr. Rehm found that Plaintiff's mild obstructive lung disease had developed into moderate obstructive lung disease and strongly recommended that Plaintiff stop smoking. (R. at 297.) He prescribed an albuterol inhaler for the condition. (R. at 297.) Plaintiff again showed no signs of edema. (R. at 297.) In February 2009, Plaintiff returned to Dr. Rehm with an upper respiratory tract infection. (R. at 299.) Dr. Rehm advised Plaintiff to continue with a course of antibiotics and prescribed additional steroids. (R. at 299.)

3

On March 22, 2009, Plaintiff went to Stafford Hospital, complaining of abdominal pain, nausea and vomiting. (R. at 722-23.) CAT scans depicted a gall bladder abnormality and Plaintiff was diagnosed with acute cholecystitis. (R. at 723.) Plaintiff underwent laparoscopic surgery to remove her gall bladder. (R. at 723.)

On June 9, 2009, Plaintiff underwent a laparotomy, a bilateral salpingo-oophorectomy and a resection of cystic mass. (R. at 445.) Plaintiff experienced chronic pelvic pain and had previously undergone a total abdominal hysterectomy for reported endometriosis. (R. at 447.) There were no complications from the surgery and Plaintiff was discharged three days later. (R. at 446-47.) On June 15, 2009, Plaintiff returned to Stafford Hospital, complaining of abdominal pain and low grade fevers. (R. at 675-76.) Madhuri V. Vallabhaneni, M.D. noted that Plaintiff "ha[d] been asking for pain medicines and nausea medicines" and "ha[d] been seeking more pain medicines and nausea medicines and also Atrivan very frequently in the hospital." (R. at 676.) Plaintiff was discharged on June 21, 2009. (R. at 675.)

On June 24, 2009, Plaintiff returned to Stafford Hospital, complaining of nausea, vomiting and abdominal pain. (R. at 807.) Plaintiff underwent an endoscopy that showed an ulcer in the antrum and the second portion of the duodenum. (R. at 807-08.) Plaintiff also underwent a colonoscopy, which revealed no evidence of colitis, polyps or diverticulosis. (R. at 673-74.) Between July 2009 and July 2010, Plaintiff received treatment from the Associates in Gastroenterology in Stafford, Virginia, for abdominal pain and nausea/vomiting. (R. at 456-61, 467-71.) Doctors gave Plaintiff medications for her nausea and gastrointestinal pain. (R. at 456-61, 467-71.) Plaintiff indicated that she was smoking throughout this period. (R. at 456, 458, 469, 471.)

On August 19, 2009, Plaintiff underwent a follow-up endoscopy at Stafford Hospital that revealed a normal esophagus, a healing antral ulcer and a normal duodenal bulb with only mild redness near the second portion of the duodenal bulb. (R. at 805-06.) The doctor's overall impression was that Plaintiff experienced a healing peptic ulcer disease. (R. at 806.)

On November 24, 2009, Plaintiff met with Christopher N. Vaughn, M.D. regarding her history of low blood platelet count. (R. at 504-06.) Plaintiff tested positive for antinuclear antibodies, indicating possible lupus. (R. at 505-06.) Plaintiff had a platelet count of 140,000, up from her low of 96,000. (R. at 504.)

In December 2009, Mark Doughty, M.D. became Plaintiff's primary care physician. (R. at 606.) Dr. Doughty diagnosed Plaintiff with chronic kidney defect that limited functionality. (R. at 625.) Dr. Doughty referred Plaintiff to a rheumatologist to determine whether she had lupus and needed ongoing treatment or management. (R. at 606-7.) Plaintiff sought prescriptions for her pain, but Dr. Doughty was unwilling to prescribe pain medication without a proper work-up and diagnosis. (R. at 606.)

During December 2009, Plaintiff received treatment at Arthritis Care Center and was diagnosed with osteoarthritis in both knees. (R. at 1086.) Plaintiff was referred to a neurologist and prescribed medication for her pain. (R. at 627.) On December 15, 2009, Plaintiff returned to Dr. Vaughn to undergo further tests for possible antiphospholipid syndrome. (R. at 503.) Dr. Vaughn indicated that he needed to repeat the test over the course of several weeks for a positive diagnosis. (R. at 503.) Although the results of the tests were inconclusive, Dr. Vaughn was concerned by Plaintiff's symptoms and prescribed her anticoagulants to prevent blood clots. (R. at 499.) Plaintiff underwent cervical spine surgery in August 2010 and knee surgery in the fall of

2011. (R. at 1091, 1094.) Dr. Vaughn altered the medications for Plaintiff to resume taking after both surgeries. (R. at 1091, 1094.)

On April 13, 2010, Plaintiff returned to Stafford Hospital and received a esophagogastroduodenoscopy that revealed a normal duodenal bulb, mild gastritis in the antrum and a small hiatus hernia in the esophagus. (R. at 472.) During a follow-up appointment, Plaintiff underwent a gastric-emptying study that revealed no evidence of gastroparesis. (R. at 554.)

On April 19, 2010, Plaintiff saw Naurang S. Gill, M.D., complaining of generalized myalgias, athralgias and difficulty with balance and tremors. (R. at 565.) Plaintiff complained of difficulty holding things, dropping objects, and numbness and tingling in her hands. (R. at 565.) Plaintiff claimed that she had been walking with a limp since childhood. (R. at 565.) She further stated that she had no history of mental confusion or disorientation. (R. at 565.) Tinel and Phalen tests for carpal tunnel syndrome were positive and a motor examination revealed tremors in Plaintiff's hands. (R. at 566.) Dr. Gill found no evidence of mono- or hemi- paresis or arm drift. (R. at 566.) Dr. Gill determined that Plaintiff's hand tremors were predominantly postural without any kinetic tremor. (R. at 566.) On May 7, 2010, Plaintiff returned to Dr. Gill, and he performed an EMG/Nerve conduction study that revealed evidence of right carpal and cubital canal syndrome with no electromyographic evidence of cervical radiculopathy. (R. at 577.)

In June 2010, Plaintiff returned to Dr. Gill. (R. at 573.) Plaintiff experienced swelling in her hands and feet as a result of her medication. (R. at 573.) Although Plaintiff continued to have hand tremors, Plaintiff reported that they did not interfere with her activities of daily living. (R. at 573.) Dr. Gill noted that Plaintiff maintained good strength of the APB muscle and good

handgrips.  (R. at 573.)  On June 26, 2010, Plaintiff underwent an MRI for her cervical spine that revealed degeneration of three of her discs and stenosis of the central canal.  (R. at 570.)

On July 13, 2010, Plaintiff returned to Dr. Gill, complaining of worsening foot and back pain.  (R. at 572.)  Dr. Gill found that Plaintiff had evidence of a Babinsky sign, weakness of the right extensor hallicis longus muscle and tenderness along the lumbar spine.  (R. at 572.) Plaintiff complained of pain when she extended her cervical spine.  (R. at 572.)  Dr. Gill refilled Plaintiff's prescription for Percocet and ordered further testing.  (R. at 572.)  Dr. Gill put Plaintiff under a nerve conduction study, which revealed only mildly increased sensory latencies of peroneal and sutral nerves.  (R. at 576.)  Otherwise, the study revealed no abnormalities, no electromyographic evidence of radiculopathy or myopathy.  (R. at 576.)

During a follow-up appointment, Dr. Gill conducted a neurological evaluation supplement that indicated that Plaintiff had moderate to normal strength in the upper and lower extremities.  (R. at 637.)  The study also revealed that Plaintiff had mostly abnormal coordination, gait and station.  (R. at 637.)  Dr. Gill noted that Plaintiff had limited range of motion in her cervical spine and suggested that Plaintiff proceed with surgery.  (R. at 639.)  Dr. Gill recommended that Plaintiff take off work until further notice.  (R. at 639.)

On July 30, 2010, Archimedes Ramirez, M.D. ordered x-rays of Plaintiff's cervical and lumbar spine.  (R. at 1142.)  The x-rays revealed "[m]ultilevel degenerative changes within the cervical spine with disc space narrowing and posterior osteophyte formation."  (R. at 1142.)  On August 2, 2010, Plaintiff complained to Dr. Ramirez of pain that radiated up and down her spine, neck, shoulders, arms and legs.  (R. at 556.)  Dr. Ramirez noted that Plaintiff had good strength in both her upper and lower extremities and retained good handgrips.  (R. at 558.)  Dr. Ramirez also observed that Plaintiff had normal cognitive function.  (R. at 558.)  Plaintiff had a positive

Tinel sign for carpal tunnel syndrome over the median nerve of both wrists and the ulnar nerve at the elbows. (R. at 558.) Dr. Ramirez further noted that Plaintiff had difficulty walking, because she was pigeon-toed. (R. at 558.) Dr. Ramirez ordered an MRI of Plaintiff's cervical spine to determine whether she had cervical spondylostenosis. (R. at 559.) Plaintiff's MRI revealed multilevel degenerative changes in the cervical spine with no evidence of a cord syrinx. (R. at 551.) The MRI revealed no abnormalities of her thoracic spine. (R. at 578.)

On August 9, 2010, Plaintiff visited Michael W. Hasz, M.D. of the Virginia Spine Institute, complaining of increased neck pain and diminished quality of life. (R. at 582.) Dr. Hasz observed that Plaintiff had severe symptoms in the neck and upper extremities. (R. at 582.) Dr. Hasz reviewed Plaintiff's medical history, conducted a physical examination of Plaintiff's cervical spine and determined that Plaintiff was a candidate for surgery on the cervical spine. (R. at 584.) After examination, Dr. Hasz recommended anterior surgery to decompress the spinal cord and stabilize the spine. (R. at 595.) Significantly, Dr. Hasz noted that Plaintiff's work status was "employed without restrictions." (R. at 582.)

On August 12, 2010, Plaintiff returned to Dr. Doughty for a pre-operative consult for her cervical discectomy and fusion. (R. at 597.) Dr. Doughty observed that Plaintiff had a supple neck with a restricted range of motion, but had no tremor and full range of motion in her extremities. (R at 597-98.) Dr. Doughty medically cleared Plaintiff for surgery. (R. at 598.) Dr. Doughty noted that Plaintiff had no blood in her urine, no difficulty urinating and no increased urinary frequency. (R. at 598.)

On September 2, 2010, Plaintiff underwent cervical partial veterbrectomies with decompression of the spinal canal, cervical interbody fusions and the placement of intervertebral prosthetic devices. (R. at 663-64.) On September 5, 2010, Plaintiff was discharged from the

hospital. (R. at 653-59.) On September 6, 2010, following her cervical spine surgery, Plaintiff

went to Stafford Hospital, complaining of wheezing, low-grade fever, chest pain and severe neck

pain. (R. at 832.) Barbara Newberg, M.D. ordered an EKG that returned unremarkable results

and advised that Plaintiff's platelets be monitored. (R. at 833.) Dr. Newberg also prescribed an

Advair inhaler to relieve Plaintiff's wheezing. (R. at 833.) Plaintiff admitted that she continued

to smoke a half pack of cigarettes each day, and a CAT scan revealed extensive upper lung

airspace opacities. (R. at 827-28.) On September 6, 2010, Plaintiff visited Paul Fiore, M.D.,

seeking treatment for symptoms of an infectious disease. (R. at 826-29.) Dr. Fiore suggested

that Plaintiff would require a pulmonary consultation. (R. at 828.) On September 10, 2010, a

bronchoscopy revealed that Plaintiff had normal airways with no endobronchial lesions. (R. at

830.) An echocardiogram revealed no abnormalities and no pulmonary hypertension. (R. at

885.)

On September 21, 2010, Plaintiff underwent a resection of the upper and lower lobes of

her lung, as well as an ultrasound of the abdomen and a CT scan of the chest. (R. at 925.) The

resections revealed "focal organizing pneumonia in a background of respiratory bronchiolitis

with mild centriacinar emphysema." (R. at 969.) On September 27, 2010, Plaintiff was

discharged from Stafford Hospital. (R. at 976.) In a post-operative evaluation, Timothy

Sherwood, M.D., the doctor who performed the diagnostic wedge resection, noted that Plaintiff's

exam was "unremarkable" and that her incisions had healed. (R. at 1010.) Dr. Sherwood further

advised Plaintiff to cease smoking. (R. at 1010.)

On October 18, 2010, Plaintiff returned to Dr. Hasz for a follow-up appointment after her

surgery. (R. at 1000-02.) Plaintiff was happy with the results, noting decreased pain and

improved balance. (R. at 1000.) Plaintiff also noted that her back and leg pain had improved

since the surgery. (R. at 1000.) Dr. Hasz prescribed Percoset for pain and Robaxin for spasms.

(R. at 1001.) Dr. Hasz strongly advised Plaintiff to cease smoking to help with recovery. (R. at

1001.)

Plaintiff returned to Dr. Hasz in December 2010, complaining of pain in the cervical

spine. (R. at 1074.) Plaintiff admitted that she had only attended one session of physical therapy

for her cervical spine and "was unimpressed with the home exercises they gave her." (R. at

1074.) Thus, Plaintiff stated that she did not return for physical therapy and took care of her

husband as he recovered from surgeries. (R. at 1074.) Plaintiff described stiffness in her neck

when she drove and stated that she recently slipped and fell when she walked on ice. (R. at

1074.) Dr. Hasz prescribed Percocet for pain and recommended that Plaintiff resume physical

therapy, quit smoking and continue using a bone stimulator. (R. at 1075.) Plaintiff subsequently

underwent an MRI of the cervical spine that revealed anterior fusion of the C3-C6 vertebrae, a

solid bony protrusion across the vertebral bodies and moderate bilateral neuroforaminal

narrowing due to uncovertebral joint arthropathy. (R. at 1036.)

On April 6, 2011, Plaintiff returned to Dr. Rehm of the Pulmonary Associates of

Fredericksburg. (R. at 1033, 1194.) Dr. Rehm diagnosed Plaintiff with moderate obstructive

lung disease and instructed her to continue on Spiriva and an albuterol inhaler. (R. at 1033,

1194.) Dr. Rehm opined that many of Plaintiff's respiratory issues were related to smoking. (R.

at 1033, 1194.) He suggested that Plaintiff quit smoking and discussed beginning an exercise

program to lose weight. (R. at 1033, 1194.) During a follow-up appointment in May 2011,

Plaintiff reported that she continued to smoke, and Dr. Rehm reiterated the importance of

quitting. (R. at 1193.) Dr. Rehm opined that Plaintiff's moderate obstructive lung disease

probably resulted from smoking. (R. at 1193.) Dr. Rehm continued her on albuterol, Spiriva and

Advair, and prescribed Wellbutrin to help Plaintiff overcome her cigarette addiction. (R. at 1193.)

On July 25, 2011, Plaintiff returned to the Virginia Spine Institute, complaining of continued and increased neck pain after she ran out of Percocet. (R. at 1065.) Plaintiff indicated that her pain was better controlled with Percocet and Flexeril. (R. at 1065.) Dr. Hasz prescribed both pain medications. (R. at 1065-66.) Dr. Hasz opined that Plaintiff's pain was diffuse, the cervical and lumbar x-rays were unremarkable and recommended that Plaintiff see Neil Chatterjee, M.D. to discuss the results of Plaintiff's upcoming CT scan. (R. at 1065.)

On July 27, 2011, Dr. Chatterjee noted that Plaintiff took eight tablets of Percocet per day and suggested that Plaintiff decrease her use. (R. at 1056-59.) Dr. Chatterjee observed that Plaintiff was able to sit down and rise from a chair without assistance. (R. at 1057.) Plaintiff also appeared to walk without an assistive device and with minimal flexion of the lumbar spine. (R. at 1057.) Plaintiff could ambulate on her heels and toes, and her strength test was 5/5 bilaterally for her lower extremities. (R. at 1058.) Plaintiff's affect was normal. (R. at 1058.) Dr. Chatterjee opined that Plaintiff's pain was under "fair control with the current regimen." (R. at 1052.)

On July 29, 2011, Plaintiff went to Philip Holzknecht, M.D. of Central Virginia Orthopedics, complaining of bilateral knee pain. (R. at 1174.) A physical examination revealed crepitus in the bilateral knees, pain over the medial and lateral joint lines, and weakness of the quadriceps. (R. at 1174.) X-rays showed severe degenerative joint disease and quadriceps calcifications. (R. at 1175.) Dr. Holzknect suggested a left total knee arthroplasty. (R. at 1174.) On September 13, 2011, Plaintiff underwent a total knee arthroplasty. (R. at 1184.)

On October 25, 2011, Plaintiff revisited Dr. Rehm. (R. at 1195.) Plaintiff had ceased smoking for the previous five months. (R. at 1195.) Dr. Rehm suggested that she exercise more regularly and continued her on Advair and albuterol. (R. at 1195.) On January 9, 2012, Plaintiff returned to Dr. Rehm and complained of shortness of breath, despite having been prescribed Spiriva and albuterol. (R. at 1198-99.) Dr. Rehm attributed this to Plaintiff's increased conditioning and suggested that she continue on an exercise regimen. (R. at 1199.)

Plaintiff followed-up with Dr. Holzknect after her right knee arthroscopy in late September, October and December of 2011 and in February and March of 2012. (R. at 1177-79, 1181, 1183.) The status of Plaintiff's knee after the arthroplasty was uncomplicated. (R. at 1177-78.) In December 2011, Dr. Holznecht noted that Plaintiff had significant improvement in range of motion and strength. (R. at 1179.) He also noted that the discomfort in Plaintiff's knee had decreased. (R. at 1179.)

In January 2012, Plaintiff returned to Dr. Chatterjee for an evaluation and he refilled her pain medications. (R. at 1233-34.) Plaintiff took eight tablets of Percocet each day and asked Dr. Chatterjee to increase the strength of her Fentanyl patch. (R. at 1233.) Dr. Chatterjee determined that Plaintiff's pain was "stable and under fair control" with her pain medication regimen. (R. at 1233.) In February 2012, Plaintiff returned to Dr. Holzknecht and stated that she had progressed well with therapy. (R. at 1181.) Dr. Holzknecht also opined that Plaintiff had "[s]evere osteoarthritic changes of the right knee, worse in the patellofemoral joint." (R. at 1182.) In March 2012, Plaintiff expressed interest in undergoing a right knee arthroplasty. (R. at 1183.) Plaintiff also noted that she did not attend physical therapy sessions, because she was changing residences. (R. at 1183.)

12

On March 5, 2012, Plaintiff indicated to Dr. Chatterjee that she did not experience any new weakness in her upper or lower extremities and did not have any new problems buttoning her clothes or picking up dropped items. (R. at 1223.) Plaintiff received T5-6 and T6-7 facet joint intra-articular and spinous processes injections in March 2012, which provided "excellent relief." (R. at 1236.) Dr. Chatterjee noted in June 2012 that the thoracic injections worked well and provided her with two to four weeks of continued excellent pain relief. (R. at 1208.) Plaintiff received trigger point injections in January, February, April, May, June and August of 2012. (R. at 1203, 1209, 1215, 1221, 1229, 1234.)

On March 30, 2012, Plaintiff underwent an MRI that revealed a small left subarticular and foraminal disc protrusion contributing to left foraminal narrowing in the L4-L5 vertebrae. (R. at 1115.) An August 2012 range of motion test completed at the Arthritis Care Center revealed a normal range of motion in her upper and lower extremities, as well as her cervical and thoracolumbar spine. (R. at 621.) Plaintiff exhibited an ataxic gait and experienced constant pain. (R. at 621.)

On August 1, 2012, Plaintiff reported to Spotsylvania Regional Medical Center, complaining of severe epigastric pain. (R. at 1171.) Plaintiff was subsequently sent to the operating room where it was discovered that she had a perforated pre-pyloric ulcer. (R. at 1171.) The condition was treated with a Graham Patch. (R. at 1171.) Plaintiff was discharged on August 10, 2012. (R. at 1171.)

On October 3, 2012, Plaintiff saw physical therapist Richard Banton, P.T. for a functional capacity evaluation. (R. at 1262-65.) Mr. Banton opined that Plaintiff was unable to perform sedentary work, because she could not tolerate two continuous hours of sitting or standing and was unable to lift or carry ten pounds. (R. at 1262-63.) Additionally, Mr. Banton determined

that Plaintiff was unable to bend, stoop or squat without a significant increase in pain. (R. at 1262-63.) Mr. Banton opined that Plaintiff was a candidate for long-term disability. (R. at 1265.) On November 8, 2012, Dr. Chatterjee wrote a letter that agreed with Mr. Banton's physical therapy examination. (R. at 1271.) Dr. Chatterjee's letter did not offer any additional information. (R. at 1271.)

C.  State Agency Physicians

On January 3, 2011, R.S. Kadian, M.D. conducted a medical examination of Plaintiff and reviewed her relevant medical history. (R. at 100-07.) Dr. Kadian opined that Plaintiff could stand and walk for two hours in an eight-hour workday, lift twenty pounds occasionally and lift ten pounds frequently. (R. at 101.) Dr. Kadian noted that Plaintiff had postural difficulties and should "avoid dust and fumes because of asthma and other lung disease." (R. at 101.) Plaintiff did not need an assistive device to walk. (R. at 101.) Dr. Kadian determined that Plaintiff's statements were partially credible, doubting Plaintiff's assessment of her own pain because "[t]he claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. at 103.) Dr. Kadian found that Plaintiff's medical evidence revealed disabling symptoms "which would normally weigh in the claimant's favor." (R. at 103.) Treatment and medication effectively controlled her symptoms. (R. at 103.) Thus, Dr. Kadian determined that Plaintiff's side effects were "mild and would not interfere with the claimant's ability to perform work activities in any significant manner." (R. at 103.)

On August 16, 2011, Donald Williams, M.D. conducted a medical examination of Plaintiff and reviewed her relevant medical history. (R. at 121-23.) He determined that Plaintiff could occasionally lift and carry twenty pounds, frequently carry ten pounds and stand and walk

14

for two hours. (R. at 121.) Dr. Williams determined that Plaintiff could perform sedentary work. (R. at 125.) He opined that Plaintiff was occasionally able to climb ramps or stairs, balance, stoop, kneel, crouch and crawl. (R. at 122.) Dr. Williams advised that Plaintiff should avoid extreme cold and avoid even moderate exposure to fumes, odors, gasses or dust. (R. at 122-23.) Sharon Ames-Dennard, M.D. observed that Plaintiff did not have any significant medical impairments and could walk without an assistive device. (R. at 118.) Dr. Ames-Denard also noted that Plaintiff was able to care for pets, shop, cook, vacuum, perform light housework, drive a car, handle money and walk 200 feet without resting. (R. at 118.)

D. Plaintiff's Testimony

On October 25, 2012, Plaintiff (represented by counsel) testified before the ALJ. Plaintiff stated that she was bothered by asthma, gastrititis, duodenitis, carpal tunnel syndrome and pain in her extremities. (R. at 43-44.) Medication controlled her hypertension and esophagus GERD, and she did not have problems with hernias or renal failure. (R. at 43-44.) Plaintiff alleged that her chronic pain and limited range of motion prevented her from working. (R. at 44-45.) Plaintiff alleged that she had only half of a functioning kidney, but admitted that she never needed dialysis. (R. at 45.)

Plaintiff testified that she could sit for only fifteen minutes at a time and that she could walk with the assistance of a cane for only two minutes at a time and for no more than 200 feet. (R. at 50.) Plaintiff stated that she could not lift any weight, because it would throw off her balance. (R. at 50.) Plaintiff indicated that she could lift a coffee cup, pour from a gallon jug of milk and pick up a paperclip off of a table with either hand. (R. at 50-51.) Plaintiff also testified that she was able to visit with friends and watch movies. (R. at 53.) Plaintiff noted that she could use a computer and operate a cell phone with internet. (R. at 55-56.) Plaintiff was able to

15

dress herself, shower without assistance, wash dishes, sweep, wash clothes and drive a car. (R. at 57-60.)

E. Third Party Testimony

During the hearing, Plaintiff's husband also testified. Plaintiff's husband recounted that Plaintiff was "sick to her stomach all the time" and spent most of her time in her bedroom with the curtains closed. (R. at 73.) He stated that they moved to a different home, because Plaintiff could not walk up stairs. (R. at 73.) He also noted that Plaintiff was unable to open items, that she frequently lost her balance and that she had to reschedule doctors' appointments, because she was too sick to leave the house. (R. at 73-74.)

F. Vocational Expert Testimony

During the hearing, an impartial VE testified. (R. at 75-76.) The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, who could frequently lift or carry ten pounds, could occasionally lift or carry twenty pounds, could sit for six hours in an eight-hour work day, could stand or walk for two hours in an eight-hour day, who could constantly push or pull at the light strength level, constantly operate foot controls with both feet, occasionally climb stairs or ramps, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch or crawl, could occasionally be around unprotected heights, occasionally around moving mechanical parts, occasionally around humidity and wetness, never around pulmonary irritants and occasionally around extreme cold, could perform Plaintiff's past work. (R. at 79-80.) The VE stated that such a person could perform Plaintiff's past work at the call center of a bank. (R. at 80.)

The VE explained further that such an individual could work as a receptionist, with 230,000 jobs nationally and 4,000 jobs in Virginia; an appointment clerk, with 187,000

nationally and 2,300 jobs in Virginia; an information clerk, with 175,000 jobs nationally and 1,050 jobs in Virginia; a call-out operator, with 62,000 jobs nationally and 980 jobs in Virginia; a charge account clerk, with 61,000 jobs nationally and 950 jobs in Virginia; and as an office helper, with 94,000 jobs nationally and 1,800 jobs in Virginia. (R. at 81-82.)

## II.    PROCEDURAL HISTORY

On August 6, 2010, Plaintiff protectively filed for DIB, alleging disability from spinal stenosis, lupus anticoagulant, osteoarthritis, carpel tunnel syndrome, asthma, hypertension, renal disease and limited mobility. (R. at 95, 201-02.) Plaintiff's claim was denied both initially and upon reconsideration. (R. at 94, 137-39.) Plaintiff then requested an administrative hearing. (R. at 145-46.) On October 25, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel), Plaintiff's husband and a VE testified. (R. at 33-93.) On November 5, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled. (R. at 9-30.) On December 18, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## III.    QUESTIONS PRESENTED

1.  Did the ALJ err in assessing Plaintiff's credibility?

2.  Did the ALJ err in assigning limited weight to Plaintiff's physical therapist's opinion?

3.  Does Dr. Chaterjee's November 8, 2012 letter constitute new evidence requiring remand?

## IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.*

*Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000).  An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to her past relevant work[2] based on an assessment of

the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If such work can be performed, then benefits

will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the

analysis, such that she must prove that her limitations preclude her from performing her past

relevant work.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy.  20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v.*

*Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5).  The

Commissioner can carry her burden in the final step with the testimony of a VE.  When a VE is

called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the

claimant's RFC based on all evidence on record and a fair description of all of the claimant's

impairments, so that the VE can offer testimony about any jobs existing in the national economy

that the claimant can perform.  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the

hypothetical posed represents all of the claimant's substantiated impairments will the testimony

---

[2]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 404.1565(a), 416.965(a).

[3]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-80.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, eight hours a day, five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.*  (footnote omitted).

of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA,

then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R.

§§ 404.1520(f)(1), 416.920(f)(1).

## V.  ANALYSIS

A.  ALJ's Decision.

On October 25, 2012, the ALJ held a hearing during which Plaintiff (represented by

counsel) Plaintiff's husband and a VE testified. (R. at 33-93.) On November 5, 2012, the ALJ

issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 9-30.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA since her alleged

onset date. (R. at 14.) At step two, the ALJ determined that Plaintiff had the severe impairments

of systemic lupus erythematosus, residual limitations from a cervical spine fusion, asthma,

emphysema, carpal tunnel syndrome, gastritis and duodenitis, hernias, chronic

thrombocytopenia, major joint dysfunction, osteoarthritis and chronic renal failure. (R. at 14.)

Further, the ALJ determined that the impairments or combination of impairments did not meet or

equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(R. at 15.) At step three, the ALJ determined that Plaintiff had the RFC to perform a reduced

range of light work with the limitations that she stand or walk no more than two hours in an

eight-hour workday, only occasionally balance, stoop, kneel, crouch, crawl, climb ramps or

stairs, occasionally be exposed to unprotected heights, moving mechanical parts, humidity,

wetness and extreme cold, and never be exposed to pulmonary irritants or climb ladders, ropes or

scaffolding. (R. at 16-22.)

At step four, the ALJ determined that Plaintiff could perform her past sedentary work in

customer service for a bank. (R. at 23.) The ALJ additionally concluded at step five that even if

Plaintiff could not perform her past work in customer service, based upon Plaintiff's age, education, work experience and RFC, jobs existed in the national economy in significant numbers that Plaintiff could perform. (R. at 23-24.) Accordingly, because the ALJ determined at step four that Plaintiff could perform her past relevant work, the ALJ found that Plaintiff was not disabled under the Act. (R. at 23-24.) In the alternative, the ALJ determined at step five that Plaintiff could perform jobs existing in significant numbers such that she was not disabled under the Act. (R. at 23-24.)

Plaintiff now challenges the ALJ's decision, arguing that the ALJ erred in diminishing Plaintiff's credibility and in assigning limited weight to Plaintiff's physical therapist's opinion. (Pl.'s Mot. for Summ. J. with Supp. Mem. of Law ("Pl.'s Mem.") (ECF No. 13) at 3.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mem. for Summ. J. ("Def.'s Mem.") (ECF No. 14) at 2.) Further, Defendant argues that Dr. Chaterrjee's November 8, 2012 letter that Plaintiff cites in support of her argument is not new evidence requiring remand. (Def.'s Mem. at 23-25.)

B. The ALJ did not err in determining Plaintiff's credibility.

Plaintiff argues that the ALJ erred in diminishing Plaintiff's credibility on the basis that the objective findings of Plaintiff's medical records did not support her alleged restrictions. (Pl.'s Mem. at 4-5.) Defendant counters that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must

follow a two-step analysis.  *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R.

§§ 404.1529(a), 416.929(a).  The first step is to determine whether there is an underlying

medically determinable physical or mental impairment or impairments that reasonably could

produce the individual's pain or other related symptoms.  SSR 96-7p at 1-3.  The ALJ must

consider all of the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5,

n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant

medical evidence in the record.").  If the underlying impairment reasonably could be expected to

produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a

claimant's statements about the intensity and persistence of the pain and the extent to which it

affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take

into account "all the available evidence," including a credibility determination of the claimant's

statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for

the weight given to the individual's statements.  *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

   This Court must give great deference to the ALJ's credibility determinations.  *Eldeco,*

*Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Fourth Circuit has determined that

"[w]hen factual findings rest upon credibility determinations, they should be accepted by the

reviewing court absent 'exceptional circumstances.'"  *Id.* (quoting *N.L.R.B. v. Air Prods. &*

*Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)).  Therefore, this Court must accept the ALJ's

factual findings and credibility determinations unless "'a credibility determination is

unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason

at all.'"  *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir.

1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to produce some symptoms of the type alleged; however, the ALJ determined that Plaintiff's contentions as to the intensity, persistence and limiting effects were not credible in light of the record as a whole. (R. at 21-22.) The ALJ specifically diminished Plaintiff's credibility as being unsupported by her treatment record. (R. at 17.) Substantial evidence supports the ALJ's determination.

Medical records support the ALJ's credibility determination. The records reveal a consistent pattern of Plaintiff overcoming medical issues with medication and surgery. On October 18, 2010, after Plaintiff's cervical spine surgery, Plaintiff enjoyed less back and leg pain and stated that she was happy with the results. (R. at 1000.) Following Plaintiff's knee surgery, on December 19, 2011, Dr. Holzknect noted that Plaintiff had significant improvement in range of motion and strength, and that Plaintiff's discomfort in her knee had decreased. (R. at 1179, 1181.) In January 2012, Dr. Chatterjee noted that Plaintiff's pain was under control with pain medication. (R. at 1233.) Plaintiff's lupus anticoagulant was managed with medication. (R. at 499.) Plaintiff's epigastric pain responded to treatment. (R. at 806, 1171.) Medical evidence showed that Plaintiff's respiratory issues were due to smoking and were treated with medication. (R. at 1033, 1194, 1199.)

24

Medical records also support that Plaintiff retained physical capabilities.  On July 27, 2011, Dr. Chatterjee observed that Plaintiff could sit down and rise from a chair without assistance and walk without an assistive device. (R. at 1057.)  Dr. Chatterjee also noted that Plaintiff did not experience difficulty buttoning clothes or dropping items. (R. at 1228.)  He also opined that Plaintiff's pain was stable and under control. (R. at 1233.)  Dr. Ramirez, Dr. Gill and Dr. Hasz corroborated Dr. Chatterjee's opinion and medical evidence showed that Plaintiff had good strength in the upper and lower extremities, as well as good hand grips. (R. at 558, 573, 621, 637, 1057-58.)

Dr. Kadian noted that the record revealed Plaintiff's symptoms were controllable with treatment and medication. (R. at 103.)  Dr. Kadian further explained that Plaintiff described daily activities that were inconsistent with Plaintiff's assessment of her disability. (R. at 103. )  Dr. Williams opined that Plaintiff did not have significant medical impairments and could walk without an assistive device. (R. at 118.)  He further determined that Plaintiff could perform sedentary work and could climb stairs, stoop, balance and crawl. (R. at 122.)

Plaintiff's own statements also support the ALJ's credibility determination.  Plaintiff claimed that she could not lift heavy objects or pick up items, but admitted that she could lift a gallon jug, pick up paper clips off a table, and use a phone with internet capabilities. (R. at 50-51, 55-56.)  Plaintiff further claimed that she could walk 200 feet. (R. at 50.)  Plaintiff testified that she could dress herself, visit with friends, wash dishes, launder clothes, sweep and drive a car. (R. at 53, 57-60.)  Therefore, substantial evidence supports the ALJ's decision.

C. The ALJ did not err in affording Plaintiff's physical therapist's opinion limited
weight.

Plaintiff argues that the ALJ erred in assessing Mr. Banton's opinion. (Pl.'s Mem. at 4-
5.) Defendant contends that substantial evidence supports the ALJ's decision to give Mr.
Banton's opinion limited weight. (Def.'s Mem. at 23-24.)

During the sequential analysis, when the ALJ determines whether the claimant has a
medically-determinable severe impairment, or combination of impairments that would
significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ
must analyze the claimant's medical records that are provided and any medical evidence
resulting from consultative examinations or medical expert evaluations that have been ordered.
20 C.F.R. §§ 404.1512(a)-(e), 404.1527 , 416.912(a)-(e), 416.927.  When the record contains a
number of different medical opinions, including those from Plaintiff's treating sources,
consultative examiners or other sources that are consistent with each other, then the ALJ makes a
determination based on that evidence.  20 C.F.R. §§ 404.1520b(a), 416.920b(a).  If, however, the
medical opinions are inconsistent internally with each other or other evidence, the ALJ must
evaluate the opinions and assign them respective weight to properly analyze the evidence
involved.  20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the regulations, only an "acceptable medical source" may be considered a treating
source that offers an opinion entitled to controlling weight.  SSR 06-03p.  Acceptable medical
sources include licensed physicians, licensed or certified psychologists and certain other
specialists, depending on the claimed disability.  20 C.F.R. §§ 404.1527(a), 416.913(a).  The

26

regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[4]

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinions: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

---

[4]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

In this case, the ALJ was forced to reconcile divergent opinions offered by several different sources, including treating sources and other sources. The ALJ did not give any treating source controlling weight. Accordingly, the ALJ weighed the various opinions, including the opinion of Mr. Banton — a physical therapist and other source under the regulations. In doing so, the ALJ afforded Mr. Banton's opinion limited weight, because it was inconsistent with other evidence in the record, including Plaintiff's testimony, longitudinal objective findings, the conservative ongoing treatment and Plaintiff's stated functional capabilities. (R. at 22.) Substantial evidence supports the ALJ's decision.

Medical records support the ALJ's determination to afford Mr. Banton's opinion limited weight. As previously noted, the records reveal a pattern of Plaintiff overcoming medical issues with medication and surgery. On October 18, 2010, Plaintiff stated that cervical spine surgery resulted in less leg and back pain. (R. at 1000.) After Plaintiff underwent knee surgery, on December 19, 2011, Dr. Holzknect found that Plaintiff had an improved range of motion and less discomfort in her knee. (R. at 1179, 1181.) In January 2012, Dr. Chatterjee opined that Plaintiff's pain was under control with pain medication. (R. at 1233.) Although Plaintiff had epigastric pain in 2009 and 2012, the record reveals that on both occasions she responded to treatment (R. at 806, 1171.) Dr. Rehm noted that Plaintiff's respiratory issues were due to smoking and treated the condition with medication. (R. at 1033, 1194, 1199.)

Medical records further demonstrate Plaintiff's physical capabilities. On June 18, 2010, Dr. Gill opined that Plaintiff maintained good strength in her muscles and hand grips. (R. at 573.) On August 25, 2010, Dr. Ramirez observed that Plaintiff retained good strength in both upper and lower extremities, including her hand grips. (R. at 558.) On July 27, 2011, Dr. Hasz observed that Plaintiff could sit in a chair comfortably and that she could get in and out of the

chair without significant difficulty. (R. at 1057.) In July 2011, Dr. Chatterjee observed that Plaintiff could walk without an assistive device and could sit down and rise from a chair without assistance. (R. at 1057.) Dr. Chatterjee further noted that Plaintiff could control her pain with medication. (R. at 1052.) Dr. Chatterjee reiterated his opinion that pain medication helped and that Plaintiff demonstrated no difficulties in buttoning her clothes or dropping items. (R. at 1228.)

The state agency physicians' examinations also support the ALJ's determination. Dr. Kadian's function report noted that Plaintiff described daily activities that are inconsistent with her alleged condition. (R. at 103.) Plaintiff remained capable of occasionally climbing stairs, balancing, stooping, kneeling, crouching and crawling. (R. at 104.) In addition, Dr. Kadian stated that medical records revealed that Plaintiff's pain was managed through treatment and medication. (R. at 103.) Dr. Williams concurred with Dr. Kadian in his function report and determined that Plaintiff could perform sedentary work. (R. at 125.) He opined that Plaintiff could climb stairs, stoop, balance, and kneel. (R. at 122.)

Plaintiff's own statements further support the ALJ's decision to give Mr. Banton's statements limited weight. Plaintiff alleged that she could sit for only fifteen minutes at a time or walk for two minutes up to a distance of 200 feet. (R. at 50.) Plaintiff further alleged that she was unable to lift any weight; however, she noted that she could pour from a gallon jug. (R. at 50-51.) Plaintiff could drive a car to visit friends, operate a phone with internet and complete household chores including laundering clothes, washing dishes, sweeping and showering without assistance. (R. at 53, 55-60.) Therefore, substantial evidence supports the ALJ's decision to afford Mr. Banton's opinion limited weight.

D. Dr. Chatterjee's November 8, 2012 letter does not constitute new evidence requiring remand.

In support of her argument that the ALJ erred in assessing Mr. Banton's opinion, Plaintiff cites to a November 8, 2012 letter from Dr. Chatterjee stating that Dr. Chatterjee agreed with Mr. Banton's assessment. (Pl.'s Mem. at 3.) Dr. Chatterjee's letter was not before the ALJ, but was available to the Appeals Council. Defendant argues that this letter does not constitute new evidence warranting remand. (Def.'s Mem. at 23-25.) Although Plaintiff does not specifically argue that the Appeals Council should have reversed the ALJ in light of Dr. Chatterjee's letter, Plaintiff uses the letter in support of her argument that the ALJ erred in assessing Mr. Banton's opinion. Therefore, the Court will discuss whether this new evidence warrants a remand.

In determining whether the ALJ's decision was supported by substantial evidence, a district court may not consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence). Although the Court may not consider evidence that was not presented to the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing. *Id.* The second is a "sentence six" remand, which provides that the court "may at any time order additional evidence to be taken before the Commissioner of Social

Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

A reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time that the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). Because Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

Plaintiff satisfies the third and fourth requirements of *Borders*. Good cause for Plaintiff's failure to submit earlier exists simply because the November 8, 2012 letter was completed after the ALJ issued his November 5, 2012 written opinion. Plaintiff has also made a general showing of the nature of the new evidence, because she has entered the letter into the record and discussed the letter in her motion.

Plaintiff fails, however, to show that the new evidence is material and not merely cumulative. Evidence must be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before the ALJ. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted). Had the ALJ considered Dr. Chatterjee's letter, the Commissioner's decision would not have reasonably been different.

Dr. Chatterjee's letter merely states that he had reviewed and agreed with Mr. Banton's Functional Capacity Evaluation opining that Plaintiff did not qualify for employment at any level. (R. at 1271.) The letter offers nothing more than an agreement with Mr. Banton's

31

opinion. As noted above, the ALJ considered and weighed Mr. Banton's opinion, and the ALJ did not err in his treatment of Mr. Banton's opinion. The letter merely agreed with substantive evidence already before the ALJ. And, to the extent that Dr. Chatterjee offered an opinion, he opined that Mr. Banton's conclusion that Plaintiff did not qualify for employment at any level was correct. The determination of whether Plaintiff is disabled for the purposes of employment is one reserved for the Commissioner. 20 C.F.R. §§ 404.1527(d)(3)-(4), (e). Accordingly, because the letter offers nothing more than an agreement with a physical therapist's assessment that was already before the ALJ and because Dr. Chatterjee opined on an issue reserved for the Commissioner to the extent that his letter offered an opinion, Plaintiff fails to satisfy the first two *Borders* requirements. Therefore, the newly offered evidence fails to meet the requirements for remand.

CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: February 5, 2015

33